# EXHIBIT A

Filed and Attested by the
Office of Judicial Records
24 JUL 2026 04:42 pm
L. BREWINGTON

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

REYNALDO RIVERA,
*Plaintiff.*

v.

DRAFTKINGS INC.; CROWN PA GAMING, INC.; FLUTTER ENTERTAINMENT, PLC; FANDUEL GROUP PARENT LLC; BETFAIR INTERACTIVE US, LLC; and FANDUEL PA LLC; FANDUEL INC.,
*Defendants.*

July Term 2026

Case No.:________

**Jury Trial Demanded**

## NOTICE TO DEFEND

### NOTICE

**You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.**

***You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.***

**Philadelphia Bar Association**
**Lawyer Referral**
**and Information Service**
**One Reading Center**
**Philadelphia, Pennsylvania 19107**
**(215) 238-6333**
**TTY (215) 451-6197**

### AVISO

**Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decider a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.**

***Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.***

**Asociacion De Licenciados**
**De Filadelfia**
**Servicio De Referencia E**
**Informacion Legal**
**One Reading Center**
**Filadelfia, Pennsylvania 19107**
**(215) 238-6333**
**TTY (215) 451-6197**

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

REYNALDO RIVERA,
*Plaintiff.*

v.

DRAFTKINGS INC.; CROWN PA GAMING, INC.; FLUTTER ENTERTAINMENT, PLC; FANDUEL GROUP PARENT LLC; BETFAIR INTERACTIVE US LLC; and FANDUEL PA LLC; FANDUEL INC.,
*Defendants.*

July Term 2026

Case No.:________

**Jury Trial Demanded**

Plaintiff REYNALDO RIVERA by and through his attorneys, Aylstock, Witkin, Kreis, & Overholtz PLC, hereby brings this action against DraftKings Inc., Crown PA Gaming Inc. (collectively with DraftKings Inc., "DraftKings"), Flutter Entertainment plc, FanDuel Group Parent LLC, Betfair Interactive US LLC, FanDuel PA LLC, and FanDuel Inc. (collectively, "FanDuel,") (collectively with DraftKings and FanDuel, "Defendants"). Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiffs' attorneys as to all other matters:

## NATURE OF THE ACTION

1. Sports gambling mobile applications ("apps") have recently exploded in popularity. Their dangerously addictive design exploits users' vulnerabilities through constant accessibility on smartphones, turning a simple tap into an unlimited gateway for compulsive betting. DraftKings and FanDuel designed and developed two of the most popular sports betting apps. Their gambling apps track every user interaction including wagers placed, time spent on the app, and even

moments of hesitation to create hyper-personalized algorithms. Utilizing this data, they bombard gamblers, including gamblers that they know or should know are problem gamblers, with targeted notifications and advertisements precisely when they're most susceptible, like late at night or after a big loss. The apps deploy targeted promotions like "risk-free bets" and deposit bonuses that mask losses while encouraging larger wagers. They utilize "push notifications" that direct the user to revisit the app after they have been away or inactive. They additionally offer exclusive "VIP" concierge programs offering lavish perks, private account managers, and accelerated payouts to make frequent and high-volume betters feel valued and indispensable. Both DraftKings and FanDuel also offer casino gaming within their sports gambling apps, encouraging users to utilize the casino games as "instantaneous" gambling through methods such as virtual slots. The companies behind these sophisticated apps, such as DraftKings and FanDuel, knowingly refuse to implement any reasonable safeguards and, in fact, intentionally design their sports gambling platforms to addict. Consequently, their customers face massive monetary losses, bankruptcy, career loss, physical harm, and mental anguish, such as depression and even suicide when they fall into gambling addiction.

## PARTIES

2. Plaintiff REYNALDO RIVERA is a natural person and resident of Philadelphia, Pennsylvania (Philadelphia County) where he suffers from gambling addiction disorder and gambling-related anxiety and depression.

3. Defendant DraftKings, Inc. is a Nevada corporation with its principal offices in Boston, Massachusetts. Based on information and belief, DraftKings, Inc. controls and directs the Pennsylvania operations of its subsidiaries and affiliates (listed herein), including the development,



Case ID: 260702988

distribution, and operation of the DraftKings online sportsbook platform (the "DraftKings Sportsbook App") offered to consumers in Pennsylvania.

4. Defendant Crown PA Gaming Inc. is a Delaware corporation with its principal place of business in Boston, Massachusetts. Crown PA Gaming Inc. is a subsidiary of DraftKings, Inc. Crown PA Gaming, Inc. has been registered to do business in Pennsylvania at all times relevant to this action. Based on information and belief, Crown PA Gaming Inc. conducts a portion of DraftKings Inc.'s Pennsylvania business, including activities related to the operation of the DraftKings' Sportsbook App. DraftKings, Inc. and Crown PA Gaming Inc. are referred to collectively herein as "DraftKings."

5. Defendant Flutter Entertainment plc is a public limited company organized under the laws of Ireland. Flutter maintains a registered office in Dublin, Ireland, and its principal place of business in New York, New York. Flutter is the ultimate parent of the FanDuel-branded entities identified herein. Based on information and belief, Flutter exercises control over the business operations of its FanDuel subsidiaries, including the development, distribution, and operation of the FanDuel Sportsbook App offered to consumers in this Commonwealth.

6. Defendant FanDuel Group Parent LLC is a limited liability company organized under the laws of Delaware with its principal place of business in New York, New York. Based on information and belief, FanDuel Group Parent LLC conducts a portion of FanDuel's Pennsylvania business, including activities related to the operation of FanDuel's online sportsbook platform (the "FanDuel Sportsbook App"). At all relevant times, FanDuel Group Parent LLC has been registered to do business in Pennsylvania.

7. Defendant Betfair Interactive US LLC, which conducts business under the name FanDuel Sportsbook, is a limited liability company organized under the laws of Delaware with its

principal place of business in Los Angeles, California. Based on information and belief, Betfair Interactive US LLC conducts a portion of FanDuel's Pennsylvania business, including activities related to the operation of the FanDuel Sportsbook App. Betfair Interactive US LLC has been registered to do business in Pennsylvania at all times relevant to this action.

8. Defendant FanDuel PA LLC is a limited liability company organized under the laws of Pennsylvania with its principal offices in Pennsylvania. Based on information and belief, FanDuel PA LLC conducts a portion of FanDuel's Pennsylvania business, including activities related to the operation of the FanDuel Sportsbook App. At all relevant times FanDuel PA LLC has been registered to do business in Pennsylvania.

9. Defendant FanDuel Inc. is a Delaware corporation with its principal place of business in New York, New York. FanDuel Inc. has been registered to do business in Pennsylvania at all times relevant to this action. Based on information and belief, FanDuel Inc. conducts a portion of FanDuel's Pennsylvania business, including activities related to the operation of the FanDuel Sportsbook App.

10. Defendants Flutter Entertainment plc, FanDuel Group Parent LLC, Betfair Interactive US LLC, FanDuel PA LLC, and FanDuel Inc. are referred to collectively herein as "FanDuel."

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over the instant civil matter pursuant to 42 Pa.C.S.A. § 931, which provides the Courts of Common Pleas with jurisdiction over this action, as the law vests the Courts of Common Pleas with unlimited jurisdiction over all actions and proceeding cognizable by law or usage in the courts of common pleas in the State of Pennsylvania.

12. This Court has personal jurisdiction over Defendants DraftKings, Inc., Crown PA Gaming Inc., Flutter Entertainment plc, FanDuel Group Parent LLC, Betfair Interactive US LLC, and FanDuel Inc. pursuant to 42 Pa.C.S.A. § 5301(a) as each of these Defendants as registered as a foreign entity in the Commonwealth of Pennsylvania, and in registering, has consented to the exercise of personal jurisdiction of the Courts of this Commonwealth.

13. This Court has personal jurisdiction over Defendant FanDuel PA LLC Corporation pursuant to 42 Pa.C.S.A. § 5301(a)is incorporated under the laws of Pennsylvania and are therefore subject to the personal jurisdiction of this Commonwealth.

14. This Court has personal jurisdiction over Flutter Entertainment plc pursuant to 42 Pa.C.S.A. § 5322. Based on information and belief, Flutter directs and controls the business strategy, product design, and technology development of the FanDuel Sportsbook App offered to consumers in this Commonwealth. Flutter's own Fourth Quarter and Full Year 2025 Financial Results asserted that, through the FanDuel sports-betting strategy, "[they] are leveraging [their] scale, proprietary technology, and data advantages to deliver differentiated experiences competitors cannot easily replace. [Flutter] is also continuing to invest in making every interaction – from login and payments to live betting and cash out -faster, simpler, and more reliable . . ." and Flutter is also "enhancing how customers," including those in Pennsylvania, "feel recognized and rewarded, with more engaging reward experiences . . ."[1] Based on information and belief, the FanDuel entities operating in Pennsylvania act as Flutter's agents in executing the product and business strategy that Flutter directs. Flutter's direction of these acts and omissions outside this

---

[1] Letter from Peter Jackson, Chief Exec. Officer, Flutter Entm't plc, to Shareholders 6 (Feb. 26, 2026), *in* Flutter Entm't plc, Fourth Quarter and Full Year 2025 Earnings Release, https://flutter.com/media/hdshhrmb/q4-2025-earnings-release.pdf (last visited Mar. 31, 2026).



Case ID: 260702988

Commonwealth caused tortious injury within this Commonwealth, and Flutter regularly does business and solicits business in this Commonwealth.

15. Venue is proper in Philadelphia County pursuant to Penn. R. Civ. P. 1006(a)(1)-(3) and 2179(a)(2)-(4).

## STATEMENT OF FACTS

### I. Online Sports Gambling and the Industry Model

*A. The Growth of Online Sports Gambling*

16. The United States has experienced an unprecedented expansion of online sports betting and mobile gambling over the past six years. Following the Supreme Court's decision in *Murphy v. NCAA*, 584 U.S. 453 (2018), which opened the door for state-by-state legalization of sports betting, thirty-nine states and the District of Columbia have legalized sports betting in some form. An explosion in online sports gambling followed, with today's current industry landscape driven by two dominant players: Defendants DraftKings and FanDuel.

17. In an industry such as "[t]he global gambling industry," where the market "is rapidly expanding, with net losses by consumers projected to reach nearly US $700 billion by 2028," competition for attention and capital is fierce.[2]

18. Thus, it follows that this industry expansion, "is fuelled [sic] by the rise of online gambling, widespread accessibility of gambling opportunities through mobile phones, increased legalisation [sic], and the introduction of commercial gambling to new areas" where consumers

---

[2] Heather Wardle et al., *The Lancet Public Health Commission on Gambling*, 9 Lancet Pub. Health e950, e950 (2024), https://doi.org/10.1016/S2468-2667(24)00167-1 (last visited Mar. 22, 2026) (citing Pekka Sulkunen et al., Setting Limits: Gambling, Science and Public Policy (2019); Gambling Research Exchange Ontario, Proportion of Revenue from Problem Gambling (2019)).

have instantaneous and around-the-clock access to gambling and minimum barriers exist between their daily lives and their gambling.[3]

19. According to William C. Miller, Jr., President and CEO of the American Gaming Association, "[p]ropelled by another year of strong organic growth in existing online markets for both sports betting and iGaming," during the year 2024, "the commercial casino sector enjoyed a third consecutive record year with gaming revenue accelerating by 7.5 percent to $72 billion."[4] "The unprecedented success," as Mr. Miller sees it, "comes as more Americans than ever before have access to, and allocate their entertainment budgets to, the legal, regulated gaming market."[5] This has followed naturally from more users increasingly gambling on their phone via apps that allow users to wager from any location at any hour.[6]

20. Together, FanDuel and DraftKings dominate the marketplace for online gambling, generating a majority of online sports gambling revenue, resulting in a functional duopoly.[7][8]

*B. How the Industry Profits Off of User Losses and Addictive Gambling*

21. Defendants' businesses are dependent on customer losses. The more money a customer loses, the more revenue Defendants generate. This is not incidental to the business

[3] *Id.* at e950.

[4] Am. Gaming Ass'n, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry* 2 (May 2025), https://www.americangaming.org/wp-content/uploads/2025/05/AGA-State-of-the-States-2025.pdf (last visited Mar. 25, 2026).

[5] *Id.* at 2.

[6] Statista Digital Mkt. Insights, *Market Size of the Online Gambling Industry in the United States from 2017 to 2023, with a Forecast Until 2028*, Statista (Mar. 11, 2024), https://www.statista.com/forecasts/1318601/online-gambling-market-size-us (last visited Mar. 24, 2026).

[7] Matt Mariani, *Turning the Page on a Record 2024 for US Sports Betting*, Legal Sports Rep. (June 13, 2025), https://www.legalsportsreport.com/218449/2024-us-sports-betting-revenue/ (last visited Mar. 24, 2026) ("FanDuel and DraftKings remain the overwhelming market leaders, together accounting for more than 65% of the industry's output nationwide.")

[8] Flutter Entertainment plc, Annual Report (Form 10-K) at 1 (Mar. 4, 2025) ("Flutter is the world's largest leading online sports betting and iGaming operator based of revenue.").



Case ID: 260702988

model; it is the business model. DraftKings' 2025 10-K filing, for example, claims their "revenues are predominantly generated through two product offerings – Sportsbook and iGaming. These two product offerings accounted for 93%, 93%, and 91% of DraftKings' revenue for the fiscal years ended December 31, 2025, 2024, and 2023, respectively."[9]

22. DraftKings' 2025 SEC filings confirm the Company's sales and marketing costs "increased $115.0 million, or 9.1%, to $1.4 billion in 2025, from $1.3 billion in 2024 . . . ." comprising almost 23 cents for every dollar of revenue generated.[10] The goal of their marketing spend, as DraftKings puts it, is "to grow and retain our paid user base, including personalized cross-product offers and promotions, and promote brand awareness to attract the 'skin-in-the-game' sports fan. Together these investments have enabled us to create a leading product built on scalable technology, while attracting a user base that has resulted in the rapid growth of our business."[11]

*C. The Fundamental Conflict: Profitability and User Well-Being*

23. The *Lancet Public Health* Commission on Gambling published findings in October of 2024 which demonstrate that, using their power across various domains of public life, gambling companies push to frame gambling as beneficial to society, whereas the harms incurred are more so blamed on poor user choices than inherent negative qualities of gambling.[12] This aim, directed toward protecting industry perception, stifles discussions on the negative impacts of gambling and

---

[9] DraftKings Inc., Annual Report (Form 10-K), at 3-4 (Feb. 13, 2026), https://www.sec.gov/ix?doc=/Archives/edgar/data/1883685/000188368526000013/dkng-20251231.htm (last visited Mar. 22, 2026).
[10] *Id.* at 55.
[11] *Id.* at 48.
[12] Wardle et al., 9 Lancet Pub. Health at e964.



Case ID: 260702988

reveals the fundamental conflict between Defendants' business success and the well-being of their users.

24. The fact is that sports betting apps are different than any other type of gambling. Defendants' sports betting apps utilize addictive technology and features, such as "push" notifications, targeted advertisements, and personalized bonus incentives to continuously draw users back to the app.

*D. Problem Gamblers Drive Revenue*

25. In sports gambling, a small minority of gamblers drive the majority of profitability. It is therefore expected that sports gambling operators' business models are structurally focused on this subset of individuals.[13] Denoted as "Problem Gamblers," one investigation, conducted by Gemini Research, Inc. of Northampton, Massachusetts and led by Dr. Rachel A. Volberg, President of Gemini Research and a Research Professor at the University of Massachusetts Amherst's School of Public Health, analyzed the post-legalization period of sports gambling in Connecticut.[14] The study found that less than 2% of Connecticut residents, considered to be "Problem Gamblers" (the percentage of Connecticut residents estimated to have a gambling problem), were responsible for 51% of the sports betting revenue in Connecticut.[15] These findings not only demonstrate that a small minority of problematic gamblers drive Defendants' profits: they evidence that Defendants' profitability is a function of the most addicted, problem users.

## II. The Science Behind Addiction and Gambling Disorder

[13] *Id.* at e958.
[14] Gemini Research, *Impacts of Legalized Gambling in Connecticut* (Conn. Dep't of Mental Health & Addiction Servs. Jan. 2024), https://portal.ct.gov/-/media/dmhas/publications/2023-ct-final-report-jan312024.pdf (last visited Mar. 22, 2026).
[15] *Id.*



Case ID: 260702988

*A. The Neurological Mechanisms Driving Bets*

26. A 2023 review article synthesizing neuroscience and behavioral psychology literature explains how modern gambling products are engineered to exploit the human brain.[16] One of the key findings is that, "[c]ollectively, the data suggest that inconsistent reward delivery in models of gambling may represent a special case of a broader phenomenon: i.e., variability (provided it is random) may be crucial for development of sensitization to both drug- and non-drug rewards."[17] The authors further assert that "multiple sources of variability exist and operate concurrently in modern digital products," including gambling, and that ultimately, "these overlapping sources of variability will amplify the addictive potential of these products via incentive sensitization."[18] Notably, modern digital gambling products layer multiple concurrent sources of this engineered variability – variable payout size, bonus features, temporal variability in spin duration, and near-miss mechanics, to drive "perpetual escalation ('hyper-learning')" in dopaminergic signaling analogous to that produced by addictive drugs.[19] Two moderating factors amplify this process: the time course and resolution of uncertainty, and the frequency of exposure, as "both variability and frequency likely contribute to the addictive potential of a non-drug reinforcer."[20] The authors conclude that digital technology "has permitted engineering of reinforcers with addictive potential that, delivered under natural conditions, would likely never become addictive."[21]

---

[16] Luke Clark & Martin Zack, *Engineered Highs: Reward Variability and Frequency as Potential Prerequisites of Behavioural Addiction*, 140 Addictive Behavs. 107626 (2023), https://doi.org/10.1016/j.addbeh.2023.107626 (last visited Mar. 22, 2026).
[17] *Id.* at 2.
[18] *Id.* at 2.
[19] *Id.* at 2-3.
[20] *Id.* at 5.
[21] *Id.*



Case ID: 260702988

*B. Mobile Gambling Platforms Intensify Addictive Potential*

27. Mobile gambling platforms intensify the addictive properties of gambling in several independent and compounding ways. First, 24/7 access from any location eliminates the need to travel to a physical gambling venue. Second, the absence of a social environment removes the social inhibitions and shame responses that moderate in-person gambling. Third, the speed of mobile wagering — a bet can be placed in under five seconds — compresses the interval between impulse and action below the threshold at which rational deliberation can intervene. Fourth, "push" notifications, bonus alerts, and in-app badges create a persistent ambient presence in the user's daily life, inviting re-engagement at moments of boredom, stress, financial anxiety, or emotional vulnerability. Defendants utilize the combination of advanced technology and artificial intelligence paired with the tracking of personalized user data to intentionally addict users and continuously lure them back to their sports gambling apps.

28. As a result of constant access through ease-of-use Apps and the ability to bet on a Smartphone, Pennsylvania has seen a crisis emerge in the State. By just one example, though November 2025, the State of Pennsylvania's gambling hotline had already received more than twice as many calls for the year than in the year 2020, with the volume of calls topping a previous record set in 2023.[22] And according to *Philadelphia Today*, between the years 2021 and 2025, "calls to the help hotline increased by 40% . . ."[23] These increases are not arbitrary, but are a direct

---

[22] Isaac Avilucea, *Pennsylvania's Problem Gambling Hotline Calls Soar in 2025*, Axios Phila. (Dec. 17, 2025), https://www.axios.com/local/philadelphia/2025/12/17/pennsylvania-problem-gambling-hotline-calls-soar-in-2025 (last visited Mar. 31, 2026).
[23] Saleen Martin, *Youth Gambling Addiction Surges Amid Sports Betting Boom*, Phila. Today (Mar. 27, 2026), https://nationaltoday.com/us/pa/philadelphia/news/2026/03/27/youth-gambling-addiction-surges-amid-sports-betting-boom/ (last visited Mar. 31, 2026).



Case ID: 260702988

and proximate result of Defendants' online and mobile sportsbook apps intensifying addiction potential for users.

## III. Defendants' Knowledge of Addictive Design

### *A. Defendants' Knowledge of Problem Gambling Patterns*

29. DraftKings' Form 10-K for the fiscal year ended December 31, 2024 discloses that the company uses "a blend of analytics and data science" as the "foundation" of its marketing to "acquire, retain and reactivate users," and reports "Monthly Unique Payers" ("MUPs") and "Average Revenue per MUP" ("ARPMUP") as key performance indicators.[24] The filing further discloses that DraftKings deploys "data science and machine learning to help optimize conversion and monetization," including "recommendation engines" that "present betting markets to users based upon their past play history," algorithms that identify "the type of contests that a contestant is most likely to enter, along with the entry fee and prize structure that he or she will find most appealing," and "return-on-investment models that are based on gross profit paybacks, lifetime value, player segmentation and customer and revenue retention." The company also optimizes "marketing spend using data collected since the beginning of [its] operations," including "predicted lifetime value and behavior of users across various product offerings" and "personalized cross-product offers and promotions." The data infrastructure required to build individualized behavioral profiles for targeted marketing and lifetime-value modeling necessarily produces, at the individual account level, visibility into patterns characteristic of disordered gambling—including escalating engagement and sustained high-frequency play—among the users who disproportionately drive the MUP and ARPMUP metrics reported to investors. DraftKings cannot

[24] DraftKings Inc., Annual Report (Form 10-K) (Feb. 14, 2025), https://www.sec.gov/Archives/edgar/data/0001883685/000188368525000010/dkng-20241231.htm.



Case ID: 260702988

credibly disclaim knowledge of problem gambling patterns while simultaneously reporting metrics derived from the same user-level data systems it employs to maximize per-user monetization.

30. Flutter Entertainment, FanDuel's parent company, operates behavioral monitoring systems across its global platform.[25] Flutter's CEO Peter Jackson acknowledged in 2018, following a $2.8 million fine imposed by the U.K. Gambling Commission for failing to intervene when a customer exhibited problem gambling warning signs, that the company had a "responsibility to do so when [its] customers show signs of problem gambling."[26] This corporate acknowledgment of a duty to intervene, made publicly by Flutter's own CEO, establishes that Flutter/FanDuel possessed both the data capability to identify problem gambling patterns and the corporate knowledge that intervention was required.

31. Defendants have full visibility into users' concerning betting patterns and then push the users to gamble further through targeted advertising, personalized "bonus" incentives, and "push" notifications as discussed and explained above. Defendants' behavior preys on addicted gamblers, as Defendants can predict when users will escalate into dangerous addictive gambling and intentionally target users when this happens.

## IV. The Deliberate Persuasive Design Architecture

### *A. Variable Reward Mechanisms*

---

[25] *Inside Responsible Gaming: How The Flutter Edge Is Helping Customers Play Well Across the World*, Flutter Ent. (Nov. 20, 2025), https://flutter.com/news-media/blogs/inside-responsible-gaming-how-the-flutter-edge-is-helping-customers-play-well-across-the-world/ (last visited Mar. 25, 2026).

[26] *Online-Gambling Giants Conquer U.S. with Tactics Deemed Too Tough for Britain*, Reuters (July 3, 2024), https://www.cnbc.com/2024/07/03/online-gambling-giants-conquer-us-with-tactics-deemed-too-tough-for-britain.html (last visited Mar. 25, 2026); Flutter Ent., *Statement on Gambling Commission Regulatory Settlement* (Oct. 16, 2018), https://flutter.com/news-and-insights/press-releases/statement-on-gambling-commission-regulatory-settlement/ (last visited Mar. 25, 2026).



Case ID: 260702988

*i. Near Miss Engineering*

32. In a landmark 2009 study published in *Neuron*, Dr. Luke Clark and colleagues at the University of Cambridge's Behavioural and Clinical Neuroscience Institute used functional magnetic resonance imaging (fMRI) to demonstrate that near-miss gambling outcomes activate win-related brain circuitry in the ventral striatum and anterior insula despite delivering no monetary reward, and that near-miss events measurably increased participants' reported desire and motivation to continue gambling.[27] The study established that near-miss outcomes are not neutral perceptual events but are actively processed by the brain's reward system in a manner that reinforces continued play independent of the absence of any actual reward.

33. Chase and Clark extended this research in a 2010 fMRI study published in *The Journal of Neuroscience*, scanning 20 regular gamblers of varying severity. The study found that gambling severity, measured using the validated South Oaks Gambling Screen, predicted the strength of dopaminergic midbrain activation in response to near-miss outcomes: the more severe the gambling disorder, the more strongly the midbrain fired in response to a near-miss, approaching the level of response to an actual monetary win.[28]

*B. Loss Chasing Features: Frictionless Re-Entry and Asymmetric Withdrawal Barriers*

34. A 2025 peer-reviewed study published in *Addiction* by Dr. Philip Newall of the University of Bristol School of Psychological Science catalogued in granular detail the specific "sludge" and "dark pattern" mechanisms deployed by online gambling platforms to asymmetrically

---

[27] Luke Clark et al., *Gambling Near-Misses Enhance Motivation to Gamble and Recruit Win-Related Brain Circuitry*, 61 Neuron 481 (2009), https://pmc.ncbi.nlm.nih.gov/articles/PMC2658737/ (last visited Mar. 25, 2026).

[28] Henry W. Chase & Luke Clark, *Gambling Severity Predicts Midbrain Response to Near-Miss Outcomes*, 30 J. Neuroscience 6180 (2010), https://www.jneurosci.org/content/30/18/6180 (last visited Mar. 25, 2026).



Case ID: 260702988

impede exit while facilitating deposits. The study documented that: (a) gambling websites process deposits instantly while imposing delays of up to several days on withdrawals; (b) during withdrawal delays, platforms display prominent buttons prompting gamblers to reverse the withdrawal; (c) deposit pages are accessible via fewer clicks from the homepage than corresponding withdrawal pages, a deliberately engineered friction asymmetry; (d) 70% of audited gambling websites suggested in-game bet sizes greater than the minimum allowed; and (e) 60% of platforms had reality-check tools defaulted to the maximum allowed delay of four hours, the least protective configuration, rather than shorter intervals.[29] Each of these design choices is individually documentable as an affirmative product design decision by Defendants to maximize the difficulty of exit.

35. DraftKings' platform has been specifically alleged in a multi-state class action, reported by Gambling Insider in January 2026, to allow users to immediately raise self-imposed betting limits the moment a prior restriction period expires, with no enforced cooling-off period between expiration and reactivation of a higher limit.[30] Screenshots submitted in that litigation show that FanDuel and BetMGM both require three-day delays before self-imposed limit increases take effect, but DraftKings processes the limit increase immediately. This design choice directly and specifically facilitates loss chasing in the moment immediately after a user's own voluntary restraint expires, exploiting the recency of the constraint and the compulsive urge that follows it.

*C. Personalized Algorithms*

---

[29] Philip Newall, *Sludge, Dark Patterns and Dark Nudges: A Taxonomy of Online Gambling Platforms' Deceptive Design Features*, 120 Addiction 1916 (2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC12426356/ (last visited Mar. 25, 2026).

[30] *DraftKings Sued in Seven States Over Alleged Betting Limit Violations*, Gambling Insider (Jan. 9, 2026), https://www.gamblinginsider.com/news/102325/draftkings-class-action-betting-limit-violations (last visited Mar. 25, 2026).

36. A 2025 peer-reviewed study published in *Behavioral Sciences* (PMC/MDPI) analyzed behavioral data from an online gambling platform at two time points (late 2016 and spring 2021) and found that patterns consistent with AI-driven personalization were associated with increases in betting persistence, risk-taking, and tendency to retain funds on-platform rather than withdraw.[31] The study concluded that AI-driven engagement algorithms "co-create behavioral risks" and that "algorithms must not be designed to take advantage of players' impulsivity or cognitive biases. In other words, the AI should not monetize moments of temporary loss of self-control."[32] Defendants operate sophisticated AI-powered engagement platforms that, on information and belief, employ the precise personalization mechanisms the study identifies as risk-generating.

*D. VIP Loyalty Programs: Targeting and Escalating Engagement of High-Loss Users*

37. A 2017 evidence review by Dr. Michael Wohl, commissioned by the independent, non-industry Gambling Research Exchange Ontario (GREO), concluded that disordered gamblers are over-represented in gambling loyalty programs relative to the general gambling population, and that gambling loyalty programs that reward volume of play uniquely exacerbate harm in users who cannot control their gambling behavior, unlike loyalty programs in other consumer industries.[33] The report identified that the industry uses "special treatment for gamblers to soften the blow of gambling losses, making the gambler feel like a very important person (VIP)" as a

---

[31] Niklas Kolomaznik, Ewa Oborska & Dragoș-Marian Iordache, *AI Personalization and Its Influence on Online Gamblers' Behavior*, 15 Behav. Sci., art. 779 (2025), https://doi.org/10.3390/bs15060779 (last visited Mar. 25, 2026).
[32] *Id.*
[33] Michael J.A. Wohl, *Loyalty Programs in the Gambling Industry*, GREO Evidence Exchange Report (2017), https://www.greo.ca/Modules/EvidenceCentre/files/Wohl%20(2017)%20Loyalty%20programs%20in%20the%20gambling%20industry.pdf (last visited Mar. 25, 2026).



Case ID: 260702988

retention mechanism that specifically rewards the behaviors most pathognomonic of gambling disorder: frequency, deposit volume, and loss escalation.[34]

38. Defendants utilize "VIP" managers to offer personalized attention to high-volume gamblers. The "VIP" managers offer concierge services, such as free tickets to professional sporting events, often including suite access to entice users to attend. Additionally, "VIP" managers offer gambling-based incentives for users that attend their events, including promises of "bonus" bets loaded to the users' account in exchange for their attendance.

39. The "VIP" managers hired and managed by Defendants are directly available to users, including via text and phone call access where they can continuously reach out and contact users. The "VIP" managers act as an extension of the apps, offering real-time betting incentives, further luring high-volume users into addictive and excessive gambling patterns.

*E. Removal of Natural Stopping Cues*

40. Professor Natasha Dow Schüll of MIT's Program in Science, Technology, and Society conducted fifteen years of ethnographic field research in Las Vegas, published as *Addiction by Design: Machine Gambling in Las Vegas* (Princeton University Press, 2012). Schüll documented that gambling machines are deliberately engineered to induce a dissociative state she calls "the machine zone" — a psychological condition in which time, space, and external social awareness dissolve and players gamble "not to win but simply to keep playing, for as long as possible."[35] The design features producing and maintaining this state include: removal of clocks and external time cues, elimination of natural pauses between bets, high-speed continuous play, and seamless re-deposit flows. Schüll documented these as reflecting "the strategic calculations

---

[34] *Id.*
[35] Natasha Dow Schüll, Addiction by Design: Machine Gambling in Las Vegas (Princeton Univ. Press 2012), https://press.princeton.edu/books/paperback/9780691278285/addiction-by-design.



Case ID: 260702988

behind game algorithms and machine ergonomics" designed expressly to maximize "time on device." Defendants have transposed these design principles into their mobile gambling applications, as their applications allow for instantaneous betting with instant deposit mechanisms.

*F. Predatory Bonus Structure*

41. Defendants deployed "risk-free bet," "free bet," and equivalent promotional language as primary customer acquisition tools from the time of their respective state market launches through at least early 2023. Under these promotions, a user who lost their first bet received not cash but non-withdrawable "bonus" credits subject to complex wagering requirements requiring the user to continue gambling multiple times before the credit's value could be withdrawn as cash. "Risk-free" was materially false and misleading: the user's principal was indisputably at risk, was in fact lost, and could be recovered only by continued gambling. In March 2023, the American Gaming Association ("AGA"), of which both FanDuel and DraftKings were then members, formally amended its Responsible Marketing Code to ban all use of "risk-free" in advertising, acknowledging that prior promotional language was deceptive.[36] Defendants had continued to use this language while the AGA's own code was being revised, with knowledge that regulators in Ohio and Massachusetts had already taken enforcement action against these promotions, and knowing gambling advertising regulations that specifically outlawed the offer of "risk free" promotions (and promotions using similar language) were being promulgated.

*G. Microbets*

[36] Am. Gaming Ass'n, *New Updates to AGA Responsible Marketing Code Prohibit 'Risk Free'* (Mar. 2023), https://www.americangaming.org/new-updates-to-aga-responsible-marketing-code-for-sports-wagering-prohibit-risk-free-enhance-college-aged-protections/ (last visited Mar. 25, 2026); *see also Wagers and Warnings*, ABA Judges' J., Fall 2024, https://www.americanbar.org/groups/judicial/resources/judges-journal/2024-fall/wagers-warnings-state-sports-betting-advertisements/ (last visited Mar. 25, 2026).



Case ID: 260702988

42. An additional addictive feature of Defendants' online sports gambling apps is the promotion of "microbets." Microbets are in-game wagers that allow for betting on live, hyper-specific events, which often have nothing to do with the overall outcome of the sporting event. Some examples of microbets are allowing bets on the outcome of the next baseball pitch or whether the next pass will be completed in a football game.

43. These microbets allow gamblers to continuously place bets during a sporting event and provide a constant reward/loss cycle that can result in a series of dopamine boosts. These are designed to further draw the user into placing these constant bets without having to wait on the ultimate outcome of a game. Micro-betting has been continuously linked to severe problem gambling and impulsivity.[37]

**V. Suppression of Harm-Reducing Measures**

44. A July 2024 Reuters investigation, based on corporate filings, company statements, testimonies to U.K. lawmakers, job advertisements, and interviews with gamblers and former employees, documented a striking disparity: Flutter Entertainment voluntarily implemented robust consumer protection measures for its U.K. customers that it has not applied to U.S. FanDuel users.[38] In the U.K.: (a) Flutter introduced a £10-per-spin cap on online slot games in 2021 after its own internal data showed that "customer risk levels may increase more sharply" at higher stakes; (b) Flutter mandates deposit limits for U.K. customers under the age of 25; and (c) Flutter curtailed its U.K. "VIP" program after recognizing escalating harm risks.[39] In the U.S. during the

---

[37] Quintero Garzola GC, Vaccarino A. *Microbetting, Fantasy Sports and Risk of Gambling Disorder: A Scoping Review*. 40 J. Gambling Stud. 587-600 (2024) (PubMED PMID: 37452978), https://pubmed.ncbi.nlm.nih.gov/37452978/ (last visited Mar. 25, 2026).
[38] Reuters, *Online-Gambling Giants Conquer U.S. with Tactics Deemed Too Tough for Britain* (July 3, 2024), https://www.reuters.com/investigations/online-gambling-giants-conquer-us-with-tactics-deemed-too-tough-britain-2024-07-03/ (last visited Mar. 25, 2026).
[39] *Id.*



Case ID: 260702988

relevant period: FanDuel permitted spins up to $800 with no equivalent age-based stake restrictions, applied no mandatory deposit limits for users under 25, and operated a VIP program with compensation structures tied to "increas[ing] player activity and driv[ing] revenue."[40] Flutter's own CEO acknowledged a "duty to intervene when customers showed signs of problem gambling" following a £2.8 million U.K. regulatory fine in 2018 — yet this duty was not operationalized for FanDuel's U.S. platform.[41] Defendants were on constructive notice throughout the relevant period that their consumer protection measures in the United States were insufficient and likely ineffective.

45. The addictive design of Defendants' sports gambling apps is intentional. Their utilization of user data and user targeting to implement intentionally addictive features has led users, such as Plaintiff REYNALDO RIVERA, to be sucked into a vicious cycle of gambling addiction that has led to economic losses, mental anguish, and physical manifestations of that mental anguish.

**PLAINTIFF REYNALDO RIVERA SPECIFIC FACTS**

46. Plaintiff REYNALDO RIVERA placed bets and gambled through both the FanDuel and DraftKings mobile applications. He began using the DraftKings and FanDuel applications shortly after they became legal in Philadelphia in or around 2020. Plaintiff REYNALDO RIVERA began using the FanDuel and DraftKings applications to play casino-style games but eventually developed an unmanageable addiction to Defendants' gambling applications.

47. Plaintiff REYNALDO RIVERA's history of play on Defendant DraftKings' app demonstrates a rapid escalation and loss of control, of which DraftKings was all too aware. Since

---

[40] *Id.*
[41] *Id.*



Case ID: 260702988

starting to use DraftKings, Plaintiff has wagered over $1,600,000.00 with net losses of approximately $97,000.00 as of April of 2026.

48. Plaintiff REYNALDO RIVERA also wagered over $841,000.00 in gambling bets across the FanDuel Sportsbook and Casino betting application, with net losses of approximately $40,000.00 as of April 2026.

49. Plaintiff REYNALDO RIVERA constantly received targeted promotions such as free casino credits, and incentives such as betting a certain amount to trigger special promotions, intended to continually lure him back into the gambling apps and to gamble larger and larger amounts.

50. Plaintiff REYNALDO RIVERA also speaks with a “VIP” or unique DraftKings and FanDuel employee who provide frequent incentives to continuously lure him back into and or keep him using the apps.

51. Plaintiff REYNALDO RIVERA attempted to quit using Defendants’ addicting apps by attempting placing himself on the self-exclusion list, but Plaintiff was unable to cope with the interactions and outreach from the Defendants and returned to Defendants’ apps.

52. Plaintiff REYNALDO RIVERA’s gambling now consumes his life. Not only does he struggle financially but his gambling addiction has affected his ability to maintain a social life, causing significant strain in his personal relationships.

53. As a result of his addiction to the Defendants’ gambling platforms, Plaintiff REYNALDO RIVERA has experienced physical and mental health problems including irritability, anxiety and depression, gambling addiction, negative effects to his relationships, and loss of funds far more than his income. These facts, at all times relevant, were known to the Defendants, who encouraged the Plaintiff to gamble more often, and at higher levels.

**<u>COUNT I</u>**
**<u>BREACH OF WARRANTY – DEFECTIVE DESIGN</u>**
**Against All Defendants**

54. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

55. At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed and benefited from their products used by Plaintiff.

56. Defendant's apps and platforms are designed and intended to be utilized as online sports betting products.

57. Defendants' products are distributed and made available to the public through the Defendant's mobile applications.

58. Defendants' products are marketed and advertised to the public for the personal use of the end-user/consumer.

59. Defendants, as the designers, developers, managers, operators, testers, producers, labelers, marketers, advertisers, promoters, controllers, suppliers, distributors, and benefiters of their products, impliedly warranted that such products were merchantable and fit for the ordinary purposes for which they were intended.

60. Defendants breached this warranty because the online sport betting products they designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed, and benefited from were defective and unreasonably dangerous to users and consumers, including Plaintiff.

61. Defendants defectively designed their products to addict all users of their sports gambling apps.



Case ID: 260702988

62. Defendants' apps are unreasonably dangerous as designed and rely on product features that are unreasonably dangerous and addictive.

63. Plaintiff used these products in a manner in which Defendants intended and expected them to be used, and Defendants knew, or by the exercise of reasonable care, should have known, that Plaintiff would use these products without inspection for or knowledge of their addictive nature.

64. Defendants' products are defective in design and pose a substantial likelihood of harm for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.

65. Plaintiff, as the consumer of Defendants' respective products, did not expect the products to be psychologically and neurologically addictive, far beyond that which might be expected from non-online gambling and/or non-online sports betting when the products are used in their intended manner by their intended audiences.

66. Plaintiff, as the consumer of Defendants' respective products, did not expect the algorithms and other features embedded by Defendants in their respective products to make them initially and progressively more stimulative, to maximize the consumers' usage time and spending on online sports betting.

67. Plaintiff, as the consumer of Defendants' products, did not expect each Defendant's revenues and profits to be directly tied to the strength of these addictive mechanisms.

68. Defendants' respective products are likewise defectively designed in that they create an inherent risk of danger; specifically, a risk of abuse, addiction, and compulsive use beyond that which might be expected from non-online gambling and/or non-online sports betting,

which can lead to numerous harms including but not limited to gambling losses, eviction or foreclosure, bankruptcy, stress, family breakup and career loss, mental anguish, and physical harm.

69. The risks inherent in the design of Defendants' respective products significantly outweigh any benefit of such design.

70. Each of the Defendants could have utilized cost-effective, reasonably feasible alternative designs including algorithmic changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

a. Default protective limits to the amounts spent on sports betting and/or the amount of time spent on the site;
b. Opt-in restrictions to the amount spent on sports betting and/or the amount of time spent on the site;
c. Self-limiting tools, including but not limited to sports betting amount and/or time spent notifications, warnings or reports;
d. Blocks to use during certain times of day;
e. Redesigning algorithms to limit rather than promote addictive engagement;
f. Eliminating the use of "push" notifications to draw users back to the apps;
g. Limits on the strategic timing and clustering of notifications to lure back users;
h. Removing barriers to the deactivation and deletion of accounts;
i. Limiting or eliminating artificial intelligence to track individual player's gambling habits;
j. Eliminating the offering of "VIP" managers and personalized betting incentives;
k. Limiting or eliminating the use of artificial intelligence to create individualized offers and promotions to customers—especially in the near aftermath of large losses;
l. Limiting or eliminating the use of microbets and prop bets that lead to accelerated, uncontrolled gambling; and
m. Limiting or prohibiting one or more advertisements to induce gambling with phrases such as "bonus," "no sweat," "risk free," odds boosts, or similar promotions.

71. Alternative designs were available that would reduce users' addictive and compulsive engagement with each of the Defendants' respective products, and which would have

effectively served the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects.

72. Plaintiff used Defendants' products as intended and/or in reasonably foreseeable ways.

73. As a direct and proximate result of each of the respective Defendants' conduct and defectively designed product, Plaintiff developed a gambling addiction disorder and suffered physical harm, mental anguish, stress, and economic losses from online sports betting and related economic losses arising therefrom.

## COUNT II
## BREACH OF WARRANTY – FAILURE TO WARN

**Against All Defendants**

74. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

75. Defendants' sports betting apps are unreasonably dangerous as designed and rely on product features that are unreasonably dangerous.

76. At all relevant times, each Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed and benefitted from its products used by Plaintiff.

77. Plaintiff was a foreseeable user of Defendants' products.

78. Defendants' products are distributed to the public through the Defendants; respective sports gambling applications.

79. Defendants distributed and made their platforms available to Plaintiff in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to its users, as described herein, including risk of addiction and compulsive use which can lead to



Case ID: 260702988

numerous harms including gambling losses, eviction or foreclosure, bankruptcy, stress, career loss, family breakup, and physical and mental impacts, such as depression, anxiety, and irritability.

80. Defendants' products are dangerous in that they create an inherent risk of danger; specifically, a risk of abuse, addiction, and compulsive use beyond that which might be expected from non-online gambling and/or non-online sports betting, which can lead to numerous harms including but not limited to gambling losses, eviction or foreclosure, bankruptcy, stress, family breakup, loss of career, mental anguish including depression and anxiety, and the physical manifestations of that mental anguish.

81. Defendants knew or, by the exercise of reasonable care, should have known that their respective products posed risks of harm to their users considering their own internal data and knowledge regarding their products at the time of development, design, marketing, promotion, advertising, and distribution.

82. Defendants knew or, by the exercise of reasonable care, should have known that their respective products posed risks of harm to each particular user based on Defendants' personalized data collection specific to Plaintiff, including but not limited to Plaintiff's gambling habits, time spent on their apps, Plaintiff's significant losses, Plaintiff's high number of bets placed, and Plaintiff's use of his "VIP" managers.

83. Defendants' products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

a. Defendants' respective products cause addiction, compulsive use, and/or other concomitant physical and mental injuries and emotional distress;
b. Defendants' respective products harvest and utilize data in such a way that increases a user's risk of addiction to these products



Case ID: 260702988

and concomitant physical and mental injuries and emotional distress;

c. The algorithmically targeted advertisements and contact with the Plaintiff by Defendants are designed to encourage compulsive sports betting and use of the products and to discourage the Plaintiff from reducing, pausing and/or ceasing online sports betting by and through the product, thus raising the risk of harms including gambling losses and related economic losses;

d. The use of "VIP" managers providing personalized incentives to Plaintiff would further his gambling addiction by constantly luring him in to placing additional, larger bets;

e. The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another, and by algorithms and other source code design that is currently publicly unknown and unavailable for review and inspection by users and governmental entities.

84. Ordinary users, such as Plaintiff, would not have recognized the potential risks of Defendants' respective products when used in a manner reasonably foreseeable to each of the Defendants.

85. Had Plaintiff received proper or adequate warnings or instructions as to the risks of using Defendants' respective products, Plaintiff would have heeded the warnings and/or instructions.

86. Each Defendant's failure to adequately warn Plaintiff about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Plaintiff.

87. As a direct and proximate result of Defendants' conduct and failure to warn of the unreasonable risks of its products, Plaintiff suffered physical harm, mental anguish, stress, and loss of career, and further related economic losses arising therefrom due to online sports betting on Defendants' platforms.

**COUNT III**
**NEGLIGENT DESIGN**

**Against All Defendants**

88. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

89. At all relevant times, Defendants were engaged in the business of designing online sports betting apps.

90. At all relevant times, the Defendants had a duty to exercise reasonable care to carefully and properly design their products to be reasonably safe online sports betting apps.

91. Defendants breached that duty because the online sports betting apps that they designed were unreasonably dangerous and defective for the reasons described above.

92. Because of the Defendants' failure to properly design their online sports betting apps, those products were placed on the market and distributed to Plaintiff while they were in an unreasonably dangerous and defective condition.

93. Plaintiff downloaded and used the online sports betting apps, which were in an unreasonably dangerous and defective condition at the time of purchase, in a reasonably foreseeable manner and substantially as intended by the Defendants.

94. Defendants knew or by an exercise of reasonable care should have known their products would create addiction, financial collapse, physical harm, and mental anguish.

95. Defendants knew or by an exercise of reasonable care should have known their products would not generate long-term, healthy users, but would instead extract short-term value, especially from individuals at moments of optimized emotional and cognitive vulnerability.

96. As a direct and proximate result, Plaintiff suffered the injuries described above.

97. It was foreseeable that consumers like Plaintiff who used Defendants' online sports betting apps would, as a direct and proximate result, suffer those injuries.

98. In light of what they knew or should have known, Defendants should have anticipated that these injuries were a likely result of the actions and failures to act described above.

99. Through these actions and inactions, Defendants knowingly risked the financial wellbeing and mental and physical health of unsuspecting consumers, including Plaintiff, in order to continue making a profit.

## COUNT IV
## NEGLIGENT FAILURE TO WARN

**Against All Defendants**

100. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

101. At all relevant times, each Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed and benefitted from its products used by Plaintiff.

102. Plaintiff was a foreseeable user of Defendants' products.

103. At all relevant times, Defendants had a duty to exercise reasonable care to carefully and properly warn Plaintiff and the general public about the reasonably foreseeable risks and dangers of their respective products.

104. Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, addictive, and injurious when used in a reasonably foreseeable manner.

105. Because of Defendants' failure to properly design their online sports betting apps, those products were placed on the market and distributed to Plaintiff while they were in an unreasonably dangerous and defective condition.

106. Plaintiff downloaded and used the online sports betting apps, which were in an unreasonably dangerous and defective condition at the time of download, in a reasonably foreseeable manner and as intended by the Defendants.

107. Defendants offered no warnings to Plaintiff nor to the public of the addictive nature of their sports betting platforms despite their knowledge and utilization of the very features that make their apps addictive.

108. As a direct and proximate result, Plaintiff suffered the injuries described above.

109. It was foreseeable that consumers like Plaintiff who used Defendants' online sports betting apps would, as a direct and proximate result, suffer those injuries.

110. In light of what they knew or should have known, the Defendants should have anticipated that these injuries were a likely result of the actions and failures to act described above.

111. A reasonable company under the same or similar circumstances as Defendants would have provided adequate warnings to the consumers of their products.

112. Defendants could have provided adequate warnings and safeguards to consumers, such as Plaintiff, which would have prevented the harms alleged herein.

## COUNT V
## NEGLIGENCE

**Against All Defendants**

113. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.



Case ID: 260702988

114. At all relevant times, each Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed and benefitted from its products used by Plaintiff.

115. Plaintiff was a foreseeable user of Defendants' products.

116. At all relevant times, the Defendants had a duty to exercise reasonable care in the design, development, management, operation, testing, production, labeling, marketing, advertising, promotion, control, sales and distribution of their products.

117. Defendants knew or should have known that their products were dangerous, harmful, addictive, and injurious to their users when used in a reasonably foreseeable manner.

118. Defendants intentionally used targeted advertising, personalized "bonus" incentives, push notifications, and other features as discussed and explained above to prey on addicted gamblers or to hook recreational gamblers into a pattern of addiction.

119. Defendants knew or should have known their users, including Plaintiff, would not have realized the potential risks and dangers of using their sports gambling apps, including a risk of addiction, and compulsive betting, not present with other forms of gambling and/or offline sports betting.

120. Defendants could have avoided Plaintiff's injuries with minimal cost, including, for example, by not including or reconfiguring certain features and algorithms in their respective sports betting apps which harmed Plaintiff.

121. Each Defendant has breached its duties of care owed to Plaintiff through its actions, misdeeds, omissions and negligence in the design, development, management, operation, testing, production, labeling, marketing, advertising, promotion, control, sales and distribution of its products.



Case ID: 260702988

122. The breaches of duty by each Defendant include, but are not necessarily limited to the following:

a. Including features and algorithms in their respective online sports betting platforms that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of compulsive gambling and/or gambling addiction and related financial losses and other harms as discussed above;
b. Marketing and advertising to users, potential new customers, and customers that want to stop using their product both through the product itself and in general through television, internet and other media advertising;
c. Maintaining unreasonably dangerous features and algorithms in their respective platforms after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the financial, mental, emotional and physical health of its users; and
d. Utilizing "VIP" managers to offer personalized betting incentives to high volume, heavily addicted gamblers;
e. Failing to implement reasonably available means to monitor for and limit or deter excessive gambling, including patterns, frequency, or duration of use that are indicative of addiction, compulsive gambling, or excessive gambling.

123. A reasonable company under the same or similar circumstances as each Defendant would have designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed and benefitted from its online sports betting platform in a manner that is safer for and more protective of its users.

124. As a direct and proximate result, Plaintiff suffered the injuries described above.

125. It was foreseeable that people like Plaintiff who used Defendants' sports gambling apps would, as a direct and proximate result, suffer those injuries.

126. In light of what they knew or should have known, Defendants should have anticipated that these injuries were a likely result of the actions and failures to act described above.

**COUNT VI**
**INTENTIONAL MISREPRESENTATION**
**Against All Defendants**

127. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

128. As set forth in more detail above, Defendants knew about the defective condition of their sports gambling apps and the serious risks they posed to its users, including Plaintiff.

129. Defendants were under a duty to tell the public the truth and to disclose the defective condition of their addictive sports gambling apps and the serious risks they posed to users, including Plaintiff.

130. Defendants breached their duty to the public and the users of their products, including Plaintiff, by concealing, failing to disclose and making misstatements about the serious risks and addictive nature presented by their sports gambling platforms.

131. Even though Defendants knew of these risks, they intentionally concealed this information to avoid losing users and to continue to gain and addict new users.

132. By intentionally concealing and failing to disclose inherent defects in the design of their sports gambling apps, Defendants knowingly and recklessly misled the public and the users of their products, including Plaintiff, into believing that the products were not designed to addict customers to the point of bankruptcy, financial ruin and subsequent mental anguish among other injuries.

133. Defendants knew that their concealment, misstatements, and omissions were material. A reasonable person, including Plaintiff, would find information that Defendants' sports gambling apps were programmed and designed to negatively impact the users' mental capacity to



Case ID: 260702988

gamble reasonably and diminish their ability to avoid addictive gambling to be important when deciding whether to use, or continue to use, the product.

134. Plaintiff was unaware of the dangerous and addictive nature of Defendants' sports gambling platforms and was reasonable in his failure to discover them, as they were intentionally concealed by Defendants.

135. As a direct and proximate result of Defendants' material omissions, misrepresentations, and concealment of material information, Plaintiff sustained serious physical harm, including the development of a gambling addictions disorder, pain and suffering, emotional anguish, loss of earnings, and other losses for which Plaintiff is entitled to recover the damages sought in this Complaint.

## COUNT VII
## UNJUST ENRICHMENT

**Against All Defendants**

136. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

137. As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited from intentionally addicting users of their platforms and have benefitted from the money made from these users, including Plaintiff. Plaintiff would not have lost the amounts alleged herein had it not been for Defendants' deceptive and unfair conduct.

138. Defendants' retention of those payments is unjust, for other reasons, Plaintiff did not receive the promised or represented functionality, safety, or utility when Plaintiff utilized Defendants' sports gambling apps.

139. It would be inequitable and unjust to allow Defendants to retain the value Plaintiff paid in conjunction with the use of the defective product.

**COUNT VIII**
**PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. §§ 201 *ET SEQ.*)**

**Against All Defendants**

140. Plaintiff incorporates all the allegations set forth above herein.

141. Plaintiff purchased goods and/or services from DraftKings and FanDuel for Plaintiff's personal use when Plaintiff downloaded and placed bets through the DraftKings and FanDuel Sportsbook/Casino Apps.

142. Defendants DraftKings and FanDuel engaged in unfair and deceptive conduct by intentionally designing their Sportsbook/Casino Apps and or individual product features to encourage, develop, or increase compulsive and addicting gambling behavior of their users through their apps and features, including through (i) not imposing self-limiting tools, (ii) utilizing timely and persistent promotions, and (iii) using artificial intelligence to track user gambling habits to increase use of the apps, amongst other features that were designed and implemented to increase user engagement.

143. Defendants FanDuel and DraftKing's unfair and deceptive conduct also created the likelihood that Plaintiff would not reasonably be able to understand the risk of compulsive gambling that could result in addiction through exposure to the apps, and Defendants features were designed to create this exact user exposure.

144. Plaintiff justifiably relied on Defendants DraftKings and FanDuel to not create and implement their Apps and features that would result in a sports betting product that could cause Plaintiff to become addicted and suffer loss and injuries.

145. Plaintiff also justifiably relied on Defendants to not unreasonably expose him to the possibility of addiction through the Apps' features, such as the constant streams of personalized



Case ID: 260702988

betting opportunities, frequent notifications, and or promotional offers that increased Plaintiff's exposure to the Apps, the number of bets Plaintiff made, the risk that Plaintiff would become addicted, and the amount of financial loss and harm that could and did follow.

146. Defendants' unfair and deceptive trade practices and conduct were a direct and proximate cause of and a substantial factor in the physical harm that Plaintiff suffered, including his gambling addiction, depression, anxiety, irritability and related symptoms.

147. Additionally, Defendants' unfair and deceptive practices and conduct were a direct and proximate cause and substantial factor in Plaintiff suffering ascertainable financial loss from the repeated and addictive betting through the Sportsbook/Casino Apps. But for the Defendants' unfair and deceptive practices and conduct, Plaintiff would not have bet as frequently on the Sportsbook/Casino Apps and therefore would not have suffered the resulting and current financial loss.

**EQUITABLE TOLLING OF STATUTE OF LIMITATIONS**

148. Additionally, Defendants' unfair and deceptive practices and conduct were a direct and proximate cause and substantial factor in Plaintiff suffering financial loss from the repeated and addictive betting through the Sportsbook/Casino Apps. But for the Defendants' unfair and deceptive practices and conduct, Plaintiff would not have bet as frequently on the Sportsbook/Casino Apps, and therefore would not have suffered the resulting and current financial loss.

149. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

150. Defendants willfully, wantonly, and intentionally withheld information from Plaintiff and the general public concerning the known dangers associated with the use of their



Case ID: 260702988

sports gambling apps. Due to the absence of any warning by the Defendants regarding the significant addiction risk associated with their sports gambling products, Plaintiff was unaware that his use of the platforms would lead to his addiction and further economic and mental injuries.

151. To the extent that Defendant(s) may claim that one or more of Plaintiff's claims are barred by the applicable statute of limitations, Plaintiff asserts that the statute of limitations is and has been tolled by Plaintiff's discovery that the injuries were caused by Defendants' defective products and failure to properly and adequately warn of the products' risks, all as more fully set forth in this Complaint, after the injuries sustained by Plaintiff.

## PRAYER FOR RELIEF

152. WHEREFORE, Plaintiff requests judgment against Defendants for compensatory damages for all injuries and losses recoverable under law, including but not limited to:

a. REYNALDO RIVERA's gambling losses incurred on the DraftKings and FanDuel apps;

b. REYNALDO RIVERA's physical harm, including his development of a gambling addiction disorder and additional mental health conditions, suffered as a result of using DraftKings' and FanDuel's sports gambling platforms;

c. REYNALDO RIVERA's pain and suffering;

d. REYNALDO RIVERA's lost earnings;

e. All recoverable costs of this action; all legally recoverable interest; and

f. Any other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury of all claims so triable.

Dated: July 24, 2026

Respectfully Submitted,

*/s/ Francesca K. Burne*
Francesca K. Burne (P.A. Bar No.: 324523)
**AYLSTOCK, WITKIN, KREIS,**
**& OVERHOLTZ PLC**
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
Email: fburne@awkolaw.com

Jennifer M. Hoekstra
*pro hac vice forthcoming*
W. Eric Stracener
*pro hac vice forthcoming*
**AYLSTOCK, WITKIN, KREIS**
**& OVERHOLTZ PLC**
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
Email: jhoekstra@awkolaw.com
estracener@awkolaw.com

*Attorneys for Plaintiff*

Court of Common Pleas of Philadelphia County
Trial Division
# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

Filed and Attested by the Office of Judicial Records 24 JUL 2026 04:42 pm L. BREWINGTON

| | |
|---|---|
| PLAINTIFF'S NAME<br>REYNALDO RIVERA | DEFENDANT'S NAME<br>DRAFTKINGS INC. |
| PLAINTIFF'S ADDRESS<br>1103 E Tioga St<br>Philadelphiah, PA 19134 | DEFENDANT'S ADDRESS<br>222 BERKELEY ST., 5TH FLOOR,<br>BOSTON MA 02116 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME<br>CROWN PA GAMING, INC. |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS<br>222 BERKELEY ST., 5TH FLOOR,<br>BOSTON MA 02116 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME<br>FLUTTER ENTERTAINMENT, PLC |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS<br>ONE MADISON AVE.,<br>NEW YORK NY 10010 |

TOTAL NUMBER OF PLAINTIFFS: 1

TOTAL NO. OF DEFENDANTS: 7

COMMENCEMENT OF ACTION
- [x] Complaint
- [ ] Writ of Summons
- [ ] Petition Action
- [ ] Transfer From Other Jurisdictions
- [ ] Notice of Appeal

AMOUNT IN CONTROVERSY
- [ ] $50,000.00 or less
- [x] More than $50,000.00

COURT PROGRAMS
- [ ] Arbitration
- [x] Jury
- [ ] Non-Jury
- [ ] Other:
- [ ] Mass Tort
- [ ] Savings Action
- [ ] Petition
- [ ] Minor Court Appeal
- [ ] Statutory Appeals
- [ ] Commerce (Completion of Addendum Required)
- [ ] Settlement
- [ ] Minors
- [ ] W/D/Survival

CASE TYPE AND CODE (SEE INSTRUCTIONS)
Other - Tort

STATUTORY BASIS FOR CAUSE OF ACTION (SEE INSTRUCTIONS)

RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)

IS CASE SUBJECT TO COORDINATION ORDER?

| Yes | No |
|---|---|
| [ ] | [ ] |
| [ ] | [ ] |
| [ ] | [ ] |

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant:

Papers may be served at the address set forth below.

| | |
|---|---|
| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY<br>Francesca K. Burne | ADDRESS (SEE INSTRUCTIONS)<br>17 E. Main Street, Suite 200<br>Pensacola, FL 32502 |
| PHONE NUMBER<br>(850) 202-1010 / FAX NUMBER | |
| SUPREME COURT IDENTIFICATION NO.<br>324523 | E-MAIL ADDRESS<br>fburne@awkolaw.com |
| SIGNATURE<br>*/s/ Francesca K. Burne* | DATE<br>July 24, 2026 |

Case ID: 260702988

# Instructions for Completing Civil Cover Sheet

Rules of Court require that a Civil Cover Sheet be attached to any document commencing an action (whether the action is commenced by Complaint, Writ of Summons, Notice of Appeal, or by Petition). The information requested is necessary to allow the Court to properly monitor, control and dispose cases filed. A copy of the Civil Cover Sheet must be attached to service copies of the document commencing an action. The attorney or non-represented party filing a case shall complete the form as follows:

**A. Parties**

i. *Plaintiffs/Defendants*
Enter names (last, first, middle initial) of plaintiff, petitioner or appellant ("plaintiff") and defendant. If the plaintiff or defendant is a government agency or corporation, use the full name of the agency or corporation. In the event there are more than three plaintiffs and/or three defendants, list the additional parties on the Supplemental Parties Form. Husband and wife are to be listed as separate parties.

ii. *Parties' Addresses*
Enter the address of the parties at the time of filing of the action. If any party is a corporation, enter the address of the registered office of the corporation.

iii. *Number of Plaintiffs/Defendants:* Indicate the total number of plaintiffs and total number of defendants in the action.

**B. Commencement Type:** Indicate type of document filed to commence the action.

**C. Amount in Controversy:** Check the appropriate box.

**D. Court Program:** Check the appropriate box.

**E. Case Types:** Insert the code number and type of action by consulting the list set forth hereunder. To perfect a jury trial, the appropriate fees must be paid as provided by rules of court.

**Proceedings Commenced by Appeal**

Minor Court
- 5M Money Judgment
- 5L Landlord and Tenant
- 5D Denial Open Default Judgment
- 5E Code Enforcement
- Other:

Local Agency
- 5B Motor Vehicle Suspension - Breathalizer
- 5V Motor Vehicle Licenses, Inspections, Insurance
- 5C Civil Service
- 5K Philadelphia Parking Authority
- 5Q Liquor Control Board
- 5R Board of Revision of Taxes
- 5X Tax Assessment Boards
- 5Z Zoning Board
- 52 Board of View
- 51 Other:

Other:

**Proceedings Commenced by Petition**
- 8P Appointment of Arbitrators
- 8C Name Change - Adult
- 8L Compel Medical Examination
- 8D Eminent Domain
- 8E Election Matters
- 8F Forfeiture
- 8S Leave to Issue Subpoena
- 8M Mental Health Proceedings
- 8G Civil Tax Case - Petition
- Other:

***Actions Commenced by Writ of Summons or Complaint***

Contract
- 1C Contract
- 1T Construction
- 1O Other:

Tort
- 2B Assault and Battery
- 2L Libel and Slander
- 4F Fraud
- 1J Bad Faith
- 2E Wrongful Use of Civil Process
- Other:

Negligence
- 2V Motor Vehicle Accident
- 2H Other Traffic Accident
- 1F No Fault Benefits
- 4M Motor Vehicle Property Damage
- 2F Personal Injury - FELA
- 2O Other Personal Injury
- 2S Premises Liability - Slip & Fall
- 2P Product Liability
- 2T Toxic Tort
  - *T1 Asbestos*
  - *TZ DES*
  - *T2 Implant*
- 3E Toxic Waste
- Other:

Professional Malpractice
- 2D Dental
- 4L Legal
- 2M Medical
- 4Y Other:

1G Subrogation

Equity
- E1 No Real Estate
- E2 Real Estate
- 1D Declaratory Judgment
- M1 Mandamus

Real Property
- 3R Rent, Lease, Ejectment
- Q1 Quiet Title
- 3D Mortgage Foreclosure - Residential Owner Occupied
- 3F Mortgage Foreclosure - Not Residential Not Owner Occupied
- 1L Mechanics Lien
- P1 Partition
- Prevent Waste
- 1V Replevin

1H Civil Tax Case - Complaint
Other:

**F. Commerce Program**
Commencing January 3, 2000 the First Judicial District instituted a Commerce Program for cases involving corporations and corporate law issues, in general. If the action involves corporations as litigants or is deemed a Commerce Program case for other reasons, please check this block AND complete the information on the "Commerce Program Addendum". For further instructions, see Civil Trial Division Administrative Docket 01 of 2000.

**G. Statutory Basis for Cause of Action**
If the action is commenced pursuant to statutory authority ("Petition Action"), the specific statute must be identified.

**H. Related Pending Cases**
All previously filed related cases, regardless of whether consolidated by Order of Court or Stipulation, must be identified.

**I. Plaintiff's Attorney**
The name of plaintiff's attorney must be inserted herein together with other required information. In the event the filer is not represented by an attorney, the name of the filer, address, the phone number and signature is required.

**The current version of the Civil Cover Sheet may be downloaded from the FJD's website http://courts.phila.gov**

Filed and Attested by the
Office of Judicial Records
04 SEP 2026 08:03 pm
G. IMPERATO

| | |
|---|---|
| REYNALDO RIVERA,<br><br>Plaintiff,<br><br>v.<br><br>DRAFTKINGS INC., *et al.*,<br><br>Defendants. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>JULY TERM 2026<br><br>NO. 02988 |

**STIPULATION**

AND NOW, this _____ day of _____________ 2026, Plaintiff, Reynaldo Rivera, and Defendants, DraftKings Inc., Crown PA Gaming LLC (erroneously sued as Crown PA Gaming Inc.), Flutter Entertainment plc, FanDuel Group Parent LLC, Betfair Interactive US LLC, FanDuel PA LLC, FanDuel Inc., (collectively, "Defendants" and together with Plaintiff, the "Parties"), hereby jointly stipulate to and respectfully request that the Court adopt the following responsive pleading schedule.

1. Plaintiff filed his Complaint on July 24, 2026.
2. Defendants accepted service of the Complaint on August 19, 2026.
3. The Parties agree and respectfully request that the deadline for Defendants to respond to Plaintiff's Complaint be extended to **October 2, 2026.**
4. To the extent that any Defendants' initial responsive pleading is a Motion, Petition, or Preliminary Objections rather than an Answer, the Parties agree and respectfully request that the deadline for Plaintiff to file any opposition be extended to **November 12, 2026** and that the deadline for Defendants to file any reply will be **December 3, 2026**.

5. Nothing in this Stipulation shall constitute a waiver of, or prejudice to, any rights, defenses, objections, or arguments available to any party, all of which are expressly preserved.

It is so Stipulated and Agreed by the Parties:

Dated: September 4, 2026

AYLSTOCK, WITKIN, KREIS
& OVERHOLTZ PLC

*/s/ Francesca K. Burne*
Francesca K. Burne (PA ID No. 324523)
Jennifer M. Hoekstra*
W. Eric Stracener*
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
fburne@awkolaw.com
jhoekstra@awkolaw.com
estracener@awkolaw.com

**pro hac vice* motions forthcoming

*Attorneys for Plaintiff, Reynaldo Rivera*

SHOOK, HARDY & BACON L.L.P.

/s/*Erin L. Leffler*
Erin L. Leffler (PA ID No. 204507)
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, PA 19103
Telephone: (215) 278-2555
eleffler@shb.com

COVINGTON & BURLING L.L.P.
Andrew Stanner*
Gary M. Rubman*
Amber Charles*
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
Telephone: (202) 662-6000
astanner@cov.com
grubman@cov.com
acharles@cov.com

**pro hac vice* motions forthcoming

*Attorney for Defendants, Flutter Entertainment plc, FanDuel Group Parent LLC, Betfair Interactive US LLC, FanDuel PA LLC, and FanDuel, Inc.*

COZEN O'CONNOR

*/s/Matthew A. Glazer*
Matthew A. Glazer (PA ID No. 204540)
Dexter R. Hamilton (PA ID No. 50225)
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103

Telephone: (215) 665-2000
mglazer@cozen.com
dhamilton@cozen.com

COBLENTZ PATCH DUFFY & BASS LLP
Richard R. Patch*
Clifford E. Yin*
Laura Seegal*
David Beach*
One Montgomery Street, Suite 3000
San Francisco, California 94104
Telephone: (415) 391-4800
ef-rrp@cpdb.com
ef-cey@cpdb.com
ef-lrs@cpdb.com
ef-dcb@cpdb.com

JONES DAY
Steven N. Geise*
4655 Executive Drive, Suite 1500
San Diego, California 92121
Telephone: (858) 314-1170
sngeise@jonesday.com

Emily C. Baker*
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309
Telephone: (404) 581-8466
ecbaker@jonesday.com

Michael S. Quinlan*
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-1368
msquinlan@jonesday.com

* *pro hac vice* motions forthcoming

*Attorneys for Defendants, DraftKings Inc. and Crown PA Gaming LLC (erroneously sued as Crown PA Gaming Inc.)*

**BY THE COURT:**

________________________________________ J.

**CERTIFICATE OF SERVICE**

I, Erin L. Leffler, hereby certify that on September 4, 2026, I served a true and correct copy of the foregoing Stipulation via the Court's e-filing system and electronic mail as follows:

Francesca K. Burne
Jennifer M. Hoekstra
W. Eric Stracener
Aylstock, Witkin, Kreis & Overholtz PLC
17 E. Main Street, Suite 200
Pensacola, FL 32502
fburne@awkolaw.com
jhoekstra@awkolaw.com
estracener@awkolaw.com
*Attorneys for Plaintiff*

Matthew A. Glazer
Dexter R. Hamilton
Cozen O'Connor
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
mglazer@cozen.com
dhamilton@cozen.com

Richard R. Patch
Clifford E. Yin
Laura Seegal
David Beach
Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000
San Francisco, California 94104
ef-rrp@cpdb.com
ef-cey@cpdb.com
ef-lrs@cpdb.com
ef-dcb@cpdb.com

Steven N. Geise
Jones Day
4655 Executive Drive, Suite 1500
San Diego, California 92121
sngeise@jonesday.com

Emily C. Baker
Jones Day
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309
ecbaker@jonesday.com

Michael S. Quinlan
Jones Day
901 Lakeside Avenue
Cleveland, Ohio 44114
msquinlan@jonesday.com
*Attorneys for Defendants, DraftKings Inc. and Crown PA Gaming LLC*

By: */s/ Erin L. Leffler*
Erin L. Leffler

*Attorney for Defendants Flutter Entertainment plc, FanDuel Group Parent LLC, Betfair Interactive US LLC, FanDuel PA LLC, and FanDuel Inc.*

**COZEN O'CONNOR**
Matthew A. Glazer (Atty I.D. #204540)
Dexter R. Hamilton (Atty I.D. #50225)
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Telephone: (215) 665-2000
dhamilton@cozen.com
mglazer@cozen.com

Filed and Attested by the
Office of Judicial Records
14 SEP 2026 10:45 am
N. HATCHER

*Attorneys for Defendants, DraftKings Inc. and Crown PA Gaming LLC (erroneously sued as Crown PA Gaming Inc.)*

| | |
|---|---|
| REYNALDO RIVERA,<br>Plaintiff,<br>v.<br>DRAFTKINGS INC., *et al.*,<br>Defendants. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>JULY TERM 2026<br>NO. 02988 |

**ENTRY OF APPEARANCE**

TO THE PROTHONOTARY:

Please enter the appearance of Matthew A. Glazer and Dexter R. Hamilton on behalf of *Defendants, DraftKings Inc. and Crown PA Gaming LLC (erroneously sued as Crown PA Gaming Inc.)* regarding the above matter.

COZEN O'CONNOR

*/s/ Matthew A. Glazer*
Matthew A. Glazer (Atty I.D. #204540)
Dexter R. Hamilton (Atty I.D. #50225)
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Telephone: (215) 665-2000
dhamilton@cozen.com
mglazer@cozen.com

Richard R. Patch*
Clifford E. Yin*
Laura Seegal*
David Beach*
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, California 94104
Telephone: (415) 391-4800
ef-rrp@cpdb.com
ef-cey@cpdb.com
ef-lrs@cpdb.com
ef-dcb@cpdb.com

*Pro Hac Vice Application Forthcoming

*Attorneys for Defendants, DraftKings Inc. and Crown PA Gaming LLC (erroneously sued as Crown PA Gaming Inc.)*

Dated: September 14, 2026



Case ID: 260702988

**CERTIFICATE OF SERVICE**

I, Matthew A. Glazer certify that a true and correct copy of the foregoing Entry of Appearance was served via the Court's ECF system on all counsel of record.

By: *[/s/ Matthew A. Glazer]*
Matthew A. Glazer

# Court of Common Pleas - Civil

# Civil Docket Report

No Items in Cart
Log In

A $5 Convenience fee will be added to the transaction at checkout.

< New Search

## Case Description

| | |
|---|---|
| **Case ID:** | 260702988 |
| **Case Caption:** | RIVERA VS DRAFTKINGS INC. ETAL |
| **Filing Date:** | Friday , July 24th, 2026 |
| **Court:** | MAJOR JURY-COMPLEX |
| **Location:** | CITY HALL |
| **Jury:** | JURY |
| **Case Type:** | PRODUCT LIABILITY |
| **Status:** | WAITING TO LIST CASE MGMT CONF |

## Related Cases

*No related cases were found.*

## Case Event Schedule

*No case events were found.*

## Case Motions

*No case motions were found.*

## Case Parties

| Seq # | Assoc | Expn Date | Type | Name |
|---|---|---|---|---|
| 1 | | | ATTORNEY FOR PLAINTIFF | BURNE, FRANCESCA |
| **Address:** | 17 E. MAIN STREET, SUITE 200<br>PENSACOLA FL 32502<br>(850)266-2989<br>fburne@awkolaw.com | **Aliases:** | *none* | |
| | | | | |
| 2 | 1 | | PLAINTIFF | RIVERA, REYNALDO |
| **Address:** | 1103 E TIOGA ST<br>PHILADELPHIA PA 19134 | **Aliases:** | *none* | |
| | | | | |
| 3 | 12 | | DEFENDANT | DRAFTKINGS INC |
| **Address:** | 222 BERKELEY STREET 5TH FLOOR<br>BOSTON MA 02116 | **Aliases:** | *none* | |
| | | | | |
| 4 | 12 | | DEFENDANT | CROWN PA GAMING INC |
| **Address:** | 222 BERKELEY STREET 5TH FLOOR<br>BOSTON MA 02116 | **Aliases:** | *none* | |
| | | | | |
| 5 | 11 | | DEFENDANT | FLUTTER ENTERTAINMENT PLC |
| **Address:** | ONE MADISON AVE<br>NEW YORK NY 10010 | **Aliases:** | *none* | |
| | | | | |
| 6 | 11 | | DEFENDANT | FANDUEL GROUP PARENT LLC |
| **Address:** | ONE MADISON AVE<br>NEW YORK NY 10010 | **Aliases:** | *none* | |
| | | | | |
| 7 | 11 | | DEFENDANT | BETFAIR INTERACTIVE US LLC |
| **Address:** | 300 PARK AVENUE SOUTH<br>NEW YORK NY 10010 | **Aliases:** | *none* | |
| | | | | |
| 8 | 11 | | DEFENDANT | FANDUEL PA LLC |
| **Address:** | 116 PINE STREET, SUITE 320<br>HARRISBURG PA 17101 | **Aliases:** | *none* | |
| | | | | |
| 9 | 11 | | DEFENDANT | FANDUEL INC |

| | | | | |
|---|---|---|---|---|
| **Address:** | 300 PARK AVENUE SOUTH<br>NEW YORK NY 10010 | **Aliases:** | *none* | |
| | | | | |
| 10 | | | TEAM LEADER | BRIGHT, GWENDOLYN N |
| **Address:** | 1206 STOUT CENTER FOR C.J.<br>1301 FILBERT ST.<br>PHILADELPHIA PA 19107 | **Aliases:** | *none* | |
| | | | | |
| 11 | | | ATTORNEY FOR DEFENDANT | LEFFLER, ERIN L |
| **Address:** | SHOOK, HARDY & BACON L.L.P.<br>2001 MARKET STREET<br>SUITE 3000<br>PHILADELPHIA PA 19103<br>(215)575-3116<br>eleffler@shb.com | **Aliases:** | *none* | |
| | | | | |
| 12 | | | ATTORNEY FOR DEFENDANT | GLAZER, MATTHEW A |
| **Address:** | COZEN OCONNOR<br>ONE LIBERTY PLACE<br>1650 MARKET STREET, SUITE 2800<br>PHILADELPHIA PA 19103<br>(215)665-5566<br>mglazer@cozen.com | **Aliases:** | *none* | |
| | | | | |
| 13 | 12 | | ATTORNEY FOR DEFENDANT | HAMILTON, DEXTER R |
| **Address:** | ONE LIBERTY PLACE<br>1650 MARKET STREET<br>SUITE 2800<br>PHILADELPHIA PA 19103<br>(215)665-2166<br>DHAMILTON@COZEN.COM | **Aliases:** | *none* | |

## Docket Entries

| **Filing Date/Time** | **Docket Type** | **Filing Party** | **Disposition Amount** |
|---|---|---|---|
| 24-JUL-2026 04:42 PM | ACTIVE CASE | | |
| **Docket Entry:** | E-Filing Number: 2607058733 | | |
| | | | |
| 24-JUL-2026 04:42 PM | COMMENCEMENT CIVIL ACTION JURY | BURNE, FRANCESCA | |

| | | | |
|---|---|---|---|
| **Documents:** | *Click link(s) to preview/purchase the documents*<br>Final Cover | | Add All to Cart |
| **Docket Entry:** | *none.* | | |
| | | | |
| 24-JUL-2026 04:42 PM | COMPLAINT FILED NOTICE GIVEN | BURNE, FRANCESCA | |
| **Documents:** | *Click link(s) to preview/purchase the documents*<br>Rivera v. DraftKings, Inc., et al - COVER SHEET.pdf<br>Rivera v. DraftKings, Inc., et al - COMPLAINT.pdf | | Add All to Cart |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 FILED. | | |
| | | | |
| 24-JUL-2026 04:42 PM | JURY TRIAL PERFECTED | BURNE, FRANCESCA | |
| **Docket Entry:** | 12 JURORS REQUESTED. | | |
| | | | |
| 24-JUL-2026 04:42 PM | WAITING TO LIST CASE MGMT CONF | BURNE, FRANCESCA | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 04-SEP-2026 08:03 PM | STIPULATION FILED | LEFFLER, ERIN L | |
| **Documents:** | *Click link(s) to preview/purchase the documents*<br>Stipulation (Rivera).pdf | | Add All to Cart |
| **Docket Entry:** | STIPULATION TO AGREED RESPONSIVE PLEADING AND BRIEFING SCHEDULE FILED. (FILED ON BEHALF OF FANDUEL INC, FANDUEL PA LLC, BETFAIR INTERACTIVE US LLC, FANDUEL GROUP PARENT LLC AND FLUTTER ENTERTAINMENT PLC) ENTRY OF APPEARANCE FILED ON BEHALF OF FANDUEL INC, FANDUEL PA LLC, BETFAIR INTERACTIVE US LLC, FANDUEL GROUP PARENT LLC AND FLUTTER ENTERTAINMENT PLC. STIPULATION APPROVED. JUDICIAL APPROVAL NOT REQUIRED AS ALL PARTIES HAVE CONSENTED. | | |
| | | | |
| 14-SEP-2026 10:45 AM | ENTRY OF APPEARANCE | GLAZER, MATTHEW A | |
| **Documents:** | *Click link(s) to preview/purchase the documents*<br>Entry of Appearance of MG-DH (DK-Rivera)-9-10-26(118079393.1).pdf | | Add All to Cart |

| | | | |
|---|---|---|---|
| **Docket Entry:** | ENTRY OF APPEARANCE OF DEXTER R HAMILTON AND MATTHEW A GLAZER FILED. (FILED ON BEHALF OF CROWN PA GAMING INC AND DRAFTKINGS INC) | | |
| | | | |
| 14-SEP-2026 10:45 AM | JURY TRIAL PERFECTED | GLAZER, MATTHEW A | |
| **Docket Entry:** | 12 JURORS REQUESTED. | | |

^ Go to Top

Philadelphia Courts

Questions regarding cases listed on this site can be directed to the Trial Division - Civil Administration at civiladminsupport@courts.phila.gov and (215) 686-8326 or the Office of Judicial Records - Civil at OJRCivil@courts.phila.gov and (215) 686-6652.

User Accepts/Agrees to Disclaimer.